UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TYRONE D. CAROLINA,<br>Plaintiff, | : | |
| v. | : | No 3:20-cv-658 (SRU) |
| INGRID FEDER, et al.,<br>Defendants. | : | |

**INITIAL REVIEW ORDER RE: AMENDED COMPLAINT**

On May 12, 2020, Tyrone Carolina filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against seven medical and custodial staff members at Corrigan-Radgowki Correctional Center ("Corrigan"): Dr. Ingrid Feder, Nurse "Malissa," Warden Robert Martin,[1] Lieutenant "Jusseaume," Officer Daily, Lieutenant Vallero, and a nurse's assistant "Stepheny." *See* Compl., Doc. No. 1, at 1.[2] (I will refer to those parties, collectively, as the "Defendants.") Carolina alleged that his constitutional rights were violated by an unwarranted 14-day forced quarantine (from April 22, 2020 to May 6, 2020) in a non-handicap accessible cell. *See* Order, Doc. No. 7, at 3, 5.

On May 20, I denied Carolina's motion to proceed *in forma pauperis* because Carolina is subject to the three-strikes provision of the Prison Litigation Reform Act (the "PLRA"), 28 U.S.C. § 1915(g). *See id.* at 2. Although Carolina could still have proceeded *in forma pauperis* if his allegations indicated that he was "under imminent danger of serious physical injury," I

[1] Although Carolina identified that defendant only as Warden "Martin," the current Warden of Corrigan is Robert Martin. *See* Corrigan-Radgowski Correctional Center, CT DEP'T OF CORR., https://portal.ct.gov/DOC/Facility/Corrigan-Radgowski-CC (last visited Jan. 26, 2021). Indeed, in Carolina's most recent amended complaint, Carolina refers to "Robert Martin" in the body of the complaint. *See* Third Am. Compl., Doc. No. 26, at 2.

[2] Carolina commenced this action while he was incarcerated in the custody of the Connecticut Department of Correction. Recently, though, Carolina has been released from custody. *See* Notice, Doc. No. 27.

explained that Carolina had not so alleged. *See id.* at 2, 4–5. I instructed that "[a]ll further proceedings in this matter shall be held in abeyance for twenty (20) days pending Carolina's delivery of the filing fee in the amount of $400.00." *Id.* at 6.

On May 28, Carolina made a motion for reconsideration. *See* Mot. for Reconsideration, Doc. No. 10. On June 18, I denied that motion because Carolina still had not established that he was suffering from an illness that put him in "imminent danger of serious physical injury" at the time he filed his complaint. *See* Order, Doc. No. 12. The following day, I ordered the Clerk to close the case because Carolina had failed to pay the required filing fee. *See* Order, Doc. No. 13. I also dismissed this case without prejudice. On June 30, Carolina filed a motion for an extension of time to re-file this case. *See* Mot. for Ext. of Time, Doc. No. 15. I denied that motion because the "case is currently closed" and so "there are no deadlines that [Carolina] must meet." Order, Doc. No. 16. However, I reiterated that "I dismissed this case without prejudice," so "Carolina may re-file this case as an Eighth Amendment claim for deliberate indifference." *Id.*

On July 30, Carolina filed an amended complaint. *See* Am. Compl., Doc. No. 17. The same day, Carolina also filed a renewed motion for leave to proceed *in forma pauperis*. *See* Renewed Mot. to Proceed IFP, Doc. No. 18. On August 19, Carolina filed a second amended complaint. *See* Second Am. Compl., Doc. No. 20. The same day, Carolina also filed an amended, renewed motion for leave to proceed *in forma pauperis*. *See* Am. Renewed Mot. to Proceed IFP, Doc. No. 21.

I construed Carolina's second amended complaint to allege that the Defendants displayed deliberate indifference to Carolina's medical needs in violation of the Eighth Amendment's prohibition against cruel and unusual punishments. *See* Order, Doc. No. 23, at 2. I determined

that Carolina could proceed *in forma pauperis* in this action because his second amended complaint had alleged facts to satisfy the "imminent danger of serious physical injury" exception to the three-strikes provision of 28 U.S.C. § 1915(g). *Id.* at 2–3, 5. Nevertheless, I dismissed Carolina's second amended complaint without prejudice because he had neither (1) included a demand for relief in compliance with Federal Rule of Civil Procedure 8(a)(3) nor (2) alleged facts to establish the personal involvement of any defendant in an alleged constitutional violation. *See id.* at 5–7. I afforded Carolina the opportunity to file a third amended complaint that specified the relief that Carolina sought and, if Carolina sought money damages, that alleged the personal involvement of the defendants in the constitutional violation. *Id.* at 7. I advised Carolina that his third amended complaint would "completely replace the prior complaints in this action and that no portion of any prior complaints shall be incorporated into his third amended complaint by reference." *Id.*

On October 14, Carolina filed his third amended complaint. *See* Third Am. Compl., Doc. No. 26. In that complaint, Carolina makes clear that he sues the Defendants[3] in their official and individual capacities and seeks money damages and "prime medical care" for the rest of his life. *See id.* at ¶¶ 6–7, 15–16. For the following reasons, I dismiss Carolina's third amended complaint pursuant to 28 U.S.C. § 1915A.

## I.    Standard of Review

---

[3] Carolina does not name all seven Defendants in the caption of his third amended complaint; rather, he names only Defendant Feder and simply makes allegations against the other defendants in the body of his complaint. Although Rule 10(a) of the Federal Rules of Civil Procedure requires that a plaintiff list "all the parties" in a complaint's caption, courts "have found *pro se* complaints to sufficiently plead claims against defendants not named in the caption when there are adequate factual allegations to establish that the plaintiff intended them as defendants." *Imperato v. Otsego Cty. Sheriff's Dep't*, 2016 WL 1466545, at *26 (N.D.N.Y. Apr. 14, 2016) (cleaned up). Thus, I construe Carolina's third amended complaint as against all seven Defendants.

Under 28 U.S.C. § 1915A, I must review prisoner civil complaints and dismiss any portion of those complaints that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a plausible right to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Nevertheless, it is well-established that "[*p*]*ro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

## II. Background[4]

The events at issue in this lawsuit concern Carolina's forced quarantine between April 22 and May 6, 2020. I consider Carolina's allegations by defendant.

### A. Nurse Malissa

Carolina alleges that he suffers from a "very severe condition" of cardiomyopathy, has a heart defibrillator, and, as a result of a stroke suffered in 2015, is confined to a wheelchair. *See*

[4] I draw the facts from Carolina's several complaints and amended complaints and from the documents attached to and incorporated by reference into those complaints. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (holding that, for purposes of a Rule 12(b) motion, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference") (cleaned up); *Delgado v. Concepcion*, 2020 WL 7388959, at *1–2 & n.3 (D. Conn. Dec. 16, 2020) (considering, on initial review of a prisoner civil complaint, the complaint and "documents attached to and incorporated by reference" into it).

Compl., Doc. No. 1, at ¶ 1; Second Am. Compl., Doc. No. 20, at 3; Third Am. Compl., Doc. No. 26, at 14. As a result of his condition, DOC medical officials prescribed Carolina medication. Carolina alleges that that medication causes side effects such as shortness of breath and dizziness; even though Carolina has told the medical officials that he suffers from those side effects, they continue to prescribe Carolina the same medications. *See* Compl., Doc. No. 1, at ¶ 2; Third Am. Compl., Doc. No. 26 at 14. So, Carolina decided to stop taking them. *See* Compl., Doc. No. 1, at ¶ 10; Third Am. Compl., Doc. No. 26, at ¶ 2.

On April 20, Nurse Malissa approached Carolina and asked him why he stopped taking his medications. *See* Compl., Doc. No. 1, at ¶ 10. Carolina explained that they gave him bad side effects, including shortness of breath, dizziness, and headaches. *See id.* According to Carolina, Nurse Malissa then misconstrued those side effects as COVID-19 symptoms and "told a lie to Dr. Feder that [Carolina was] positive for COVID-19" by making an "unconfirm[e]d diagnos[i]s." Third Am. Compl., Doc. No. 26, at ¶ 2, 13–14. On April 22, Carolina claims that he was told by an unnamed lieutenant and officer to pack up; then Carolina was handcuffed and moved to isolation in a non-handicap accessible cell, where he was denied a shower, cell cleaning materials, clean clothes, and a change of bedding. *See* Compl., Doc. No. 1, at ¶ 9; Second Am. Compl., Doc. No. 20, at ¶ 1.[5]

[5] In his second amended complaint, Carolina alleged additional facts describing the conditions of his non-handicap cell that are not otherwise indicated in his third amended complaint. Carolina alleged that he was without running water except for a toilet and allegedly had to defecate and urinate on himself due to his handicap. Second Am. Compl., Doc. No. 20, at ¶¶ 2–3. Carolina alleged further that he "had no choice" but to use the toilet water to wash himself and even to clean his mouth after meals; that he "became very ill d[ue] to f[r]ustration," and the "filth of a dirty cell"; and that he experienced rising blood pressure, dizzy spells, chest pains, and "some kind of cold illness in the left side of my thro[a]t on the inside that will not go away." *Id.* at ¶ 3. Carolina reported that "[t]his illness will not go away," but he was "afraid to report this illness" for fear of being forced to re-quarantine for another fourteen days. *Id.* at ¶ 4; *see also* Order, Doc. No. 23, at 5 (describing those facts).

On April 23, Carolina wrote an inmate request form to Nurse Malissa complaining about her role in Carolina's being forced to quarantine. *See* Third Am. Compl., Doc. No. 26, at 13. In that form, Carolina explained that Nurse Malissa "told a lie to Dr. Feder that I am positive for Covid-19" and that Nurse Malissa thus put Carolina's life in danger "with no proof of a test." *Id.* He requested that Nurse Malissa "fix this situation." *Id.* On April 29, Carolina filed a Health Services Review ("HSR") for Diagnosis and Treatment. *See id.* at 14–15. In that HSR, Carolina again complained that Nurse Malissa had "ma[de] up fals[e] results" regarding Carolina's COVID-19 status and thus requested that Nurse Malissa be "removed from her nursing post and retrained at her own ex[]pense." *Id.* at 14. On May 5, that HSR was rejected because Carolina neither (1) requested an appropriate resolution nor (2) attached evidence of informal resolution. *Id.*

B. Dr. Feder

Around April 22, Dr. Feder ordered that Carolina be quarantined (in a non-handicap cell) because Dr. Feder was "under the assu[m]ption[]" that Carolina was COVID-19 positive. Third Am. Compl., Doc. No. 26, at ¶ 3. Carolina alleges that Dr. Feder's order was made "without proof of medical evidence that would warrant isolation." *Id.* In fact, Carolina points out that he later tested negative for COVID-19. *See id.*

On April 27, after testing negative, Carolina filed an inmate request form asking that Dr. Feder move him to a handicap cell so that he could have access to "showers, clean clo[thes], laundry, legal phone calls and social phone calls[.]" *Id.* at 8. On May 15, a DOC official responded and informed Carolina that housing was "not under the jurisdiction of your doctors" and that a necessary quarantine "supercedes all other concerns." *Id.* The response also indicated

that after inmates' quarantines are completed, they "typically can resume privileges as determined by corrections." *Id.*

On April 29, Carolina filed a HSR for Diagnosis and Treatment. *See id.* at 11–12. In that HSR, Carolina complained about Dr. Feder's decision to place him in quarantine without knowing whether he had tested positive for COVID-19. *See id.* at 11. Carolina requested that Dr. Feder "be removed from her post as doctor, and retrain[e]d at her own ex[]pense." *Id.* at 11. On May 5, a DOC official rejected Carolina's HSR because Carolina neither (1) requested an appropriate resolution nor (2) attempted informal resolution. *Id.*

On May 11, Carolina filed another HSR for All Other Health Care Issues. *See id.* at 9–10. In that HSR, Carolina complained that Dr. Feder had not responded to his April 27 inmate request and reiterated his complaints regarding Dr. Feder's professional judgment and refusal to place him in a handicap cell. *See id.* at 9. Carolina again asked that Dr. Feder "be repr[i]manded by being removed from her medical post and be retrained at her own ex[]pense." *Id.* On May 14, a DOC official rejected that HSR because (1) Carolina had not attempted informal resolution and (2) "[i]nmates do not dictate how staff issues are handled." *Id.*

C. Nurse Stepheny

While in isolation, Carolina spoke with Nurse Stepheny regarding his need for soap, a shower, and a transfer to a handicap cell. *See id.* at ¶ 4, 16–19. Nurse Stepheny treated Carolina as if he were "contaminated with Covid 19 and unsafe." *Id.* at ¶ 4. Nurse Stepheny recommended that Carolina write an inmate request concerning his issues. *See id.* On April 26, Carolina wrote an inmate request form and submitted it to Nurse Stepheny. *See id.* at 16. In that inmate request, Carolina asked for a shower, hand soap, and a handicap cell. *Id.* On May 11, Carolina submitted a HSR for All Other Health Care Issues. *See id.* at 18–19. In that HSR,

Carolina complained that Nurse Stepheny had failed to respond to his complaints and had failed to have him moved to a handicap cell so that he could "take showers, [have] cell clean ups, laundry, [and] change of bed rolls after it had been discovered that [he] was found negative of the Covid 19." *Id.* at 18. On May 14, a DOC official rejected that HSR because (1) Carolina had not attempted informal resolution and (2) "[i]nmates do not dictate how staff issues are handled." *Id.*

D. Warden Martin

Carolina spoke to Warden Martin regarding concerns about the DOC's quarantine policies; specifically, Carolina could not understand why his continued quarantine was authorized, even after Carolina had tested negative for COVID-19. *Id.* at ¶ 9. Warden Martin responded: "Write me." *Id.* So, on April 24, Carolina wrote an inmate request form to Warden Martin. *See id.* at 20. In that inmate request, Carolina asked that Warden Martin provide "an executive order . . . that states that a person can be held over 14 days after it has been discover[e]d that the person has been . . . negative after 3 days." *Id.* The same day (April 24), Carolina sent a second inmate request form to Warden Martin. *See id.* at 22. In that inmate request, Carolina indicated that he was "on Ramadan" and was "being denied showers." *Id.* Carolina inquired: "What policies restrict[] me from taking showers? Clean cell, laundry and legal phone call to my attorney?" *Id.*

On April 29, Carolina (apparently)[6] submitted a grievance regarding Warden Martin. *See id.* at 26–27. Carolina complained that Warden Martin had "abuse[d] [his] power" and "approv[ed] an unlawful[] policy that restricts inmates who are found '<u>negative</u>.'" *Id.* at 26. On

[6] There is no confirmation that Carolina filed this grievance because he did not receive a response to it. *See* Third Am. Compl., Doc. No. 26, at 26–27.

May 4, Carolina sent another inmate request form to Warden Martin. *See id.* at 21. In that inmate request, Carolina indicated that he was still waiting for a response to his inquiry regarding what DOC policy allowed officials to force an inmate to quarantine in severe conditions—no "showers, laundry, cell clean ups, legal phone calls, and social phone calls"—even after that inmate tested negative for COVID-19. *Id*.

On May 4, Warden Martin responded to Carolina's April 24 inmate request. Warden Martin wrote:

> Mr. Carolina,
>
> Connecticut is in a Governor-declared state of emergency due to a pandemic that is occurring in Connecticut and around the world caused by the novel coronavirus COVID-19. The actions that we are taking are aimed at keeping staff and inmates safe and secure during the pandemic and are in accordance with CDC guidelines for correctional and detention facilities.

*Id.* at 22.

On May 11, Carolina filed another grievance[7] regarding Warden Martin. *See id.* at 24–25. In that grievance, Carolina again claimed that Warden Martin "abuse[d] [his] powers" and "fabricat[ed]" the existence of a DOC Order authorizing Carolina's continued detention, even after Carolina had tested negative for COVID-19. *Id.* at 24. Carolina asked that "Warden Martin be repr[i]manded and be retrained at his own ex[]pense." *Id.* On May 13, a DOC official returned that grievance without disposition because Carolina (1) had to submit each grievable matter on a separate grievance form and (2) "[t]he grievance and the action requested should be stated simply and coherently." *Id.* at 41.

E. Lieutenant Vallero

[7] Although Carolina checked a box indicating that he was filing an appeal of an ADA decision, it is unclear what the ADA decision would be, and, in any event, Carolina notes in the body of the grievance that he is "filing [a] grievance." Third Am. Compl., Doc. No. 26, at 24.

While in isolation, Carolina and Lieutenant Vallero discussed Carolina's desire to be moved to a handicap cell after he tested negative. *Id.* at ¶ 10. Still, even though Lieutenant Vallero learned from Dr. Feder that Carolina had tested negative, Lieutenant Vallero declined to move Carolina to a handicap cell and to permit Carolina to shower or have a cell clean-up, laundered clothing, bed sheets, and blankets. *Id.* Thus, on April 28, Carolina wrote an inmate request form regarding Lieutenant Vallero. *See id.* at 28. In that inmate request, Carolina requested that he "be placed in to a handicap cell so that I am able to shower, cell clean up, laundry, legal phone calls and social phone calls." *Id.* It does not appear that Carolina's April 28 inmate request received a response. On May 11, Carolina filed a grievance[8] regarding Lieutenant Vallero. *See id.* at 30–31. In that grievance, Carolina alleged that Liutenant Vallero had displayed a "failure/refusal to respond and act" with respect to Carolina's complaints. *Id.* at 30. On May 13, a DOC official returned that grievance without disposition because Carolina (1) had to submit each grievable matter on a separate grievance form and (2) "[t]he grievance and the action requested should be stated simply and coherently." *Id.* at 42.

F. Lieutenant Jusseaume

Carolina also expressed his concerns to Unit Manager Lieutenant Jusseaume. *Id.* at ¶ 11. However, although Lieutenant Jusseaume was aware that Carolina had tested negative for COVID-19, he denied Carolina a move to a handicap cell and told him instead to file an inmate request. *Id.* On April 26, Carolina filed an inmate request regarding Lieutenant Jusseaume. *See id.* at 32. In that inmate request, Carolina asked to "[p]lease take a shower and to place me in to a handicap cell" where he could make "legal phone calls and social calls to family." *Id.* It does

[8] Carolina checked a box as though he were appealing a "special management decision." Third Am. Compl., Doc. No. 26, at 31. Again, though, it is not clear what "special management decision" Carolina would be appealing. Further, Carolina refers to the submission as "this grievance." *Id.* at 30.

not appear that the inmate request received a response from any DOC official. *See id.* On May 11, Carolina filed a grievance[9] regarding Lieutenant Jusseaume's "failure/refusal to respond and act" in response to Carolina's inmate request. *Id.* at 34–35. As a result, Carolina claimed that Lieutenant Jusseaume "placed my health and safety at risk." *Id.* at 34. Carolina thus requested that Lieutenant Jusseaume "be repr[i]manded by being removed off medical post as unit manager and be retrained at his own ex[]pense." *Id.* On May 13, a DOC official returned Carolina's grievance without disposition because Carolina (1) had to submit each grievable matter on a separate grievance form and (2) "[t]he grievance and the action requested should be stated simply and coherently." *Id.* at 43.

G. Officer Daily

Carolina makes substantially the same allegations regarding Officer Daily—the "Unit Officer for medical"—as he does regarding Lieutenant Jusseaume. *Id.* at ¶ 13. On April 26, Carolina wrote an inmate request form regarding Officer Daily. *Id.* at 36. In that inmate request, Carolina requested authorization for a "shower, cell clean up, change of clothes." *Id.* Carolina also requested "that the sink water be fixed" because "[i]t runs low and improper only the toilet works." *Id.* There is no indication that Carolina received a response to this inmate request. *Id.* On May 11, Carolina filed a grievance[10] regarding Officer Daily's "failure/refusal to respond and act" regarding Carolina's complaints. *Id.* at 38–39. On May 13, a DOC official returned that grievance without disposition because Carolina (1) had to submit each grievable matter on a

[9] Again, Carolina checked a box as though he were appealing a "special management decision." Third Am. Compl., Doc. No. 26, at 35. Again, though, it is not clear what "special management decision" Carolina would be appealing. Further, Carolina refers to the submission as "this grievance." *Id.* at 34.

[10] Once more, Carolina checked a box as though he were appealing an ADA decision. *See* Third Am. Compl., Doc. No. 26, at 39. Again, though, it is not clear what ADA decision Carolina would be appealing. Further, Carolina refers to the submission as "this grievance." *Id.* at 38.

separate grievance form and (2) "[t]he grievance and the action requested should be stated simply and coherently." *Id.* at 40.

**III. Discussion**

I construe Carolina's complaint as raising claims of Eighth Amendment violations based on deliberate indifference to his medical needs and his conditions of confinement.

A. Claims Against Medical Staff

Although the Constitution does not require "comfortable" prison conditions, the Eighth Amendment imposes certain duties on prison officials to "ensure that inmates receive adequate food, clothing, shelter, and medical care" and that prison officials "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (cleaned up). "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (cleaned up). That indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–105 (cleaned up).

To state an Eighth Amendment claim for deliberate indifference to health or safety, an inmate must demonstrate both an objective and a subjective element. To meet the objective element, an inmate must allege that he was incarcerated under conditions that resulted in a "sufficiently serious" deprivation, such as the denial of "the minimal civilized measure of life's necessities" or a "substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (cleaned up). To meet the subjective element, an inmate must allege that the defendant prison officials possessed culpable intent. That is, the officials must have known that the inmate faced a substantial risk to

his health or safety and disregarded that risk by failing to take corrective action. *See id.* at 834, 837. Thus, an allegation of merely negligent conduct is insufficient. *See id.* at 835. Rather, the subjective element requires that a plaintiff allege that prison officials acted with "a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006).

When evaluating a claim for failure to protect an inmate from harm or deliberate indifference to inmate safety, the court considers "the facts and circumstances of which the official was aware at the time he acted or failed to act." *Hartry v. Cty. of Suffolk*, 755 F. Supp. 2d 422, 436 (E.D.N.Y. 2010) (cleaned up). Although "mere medical malpractice is not tantamount to deliberate indifference," such medical malpractice may constitute deliberate indifference when it "involves culpable recklessness, i.e., . . . a conscious disregard of a substantial risk of serious harm." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)) (cleaned up).

1. Claims Against Nurse Malissa and Dr. Feder Regarding Their Medical Judgment

Carolina asserts that Nurse Malissa and Dr. Feder acted with deliberate indifference to his medical needs and safety based on their roles in putting and keeping Carolina in a 14-day quarantine. *See* Third Am. Compl., Doc. No. 26, at ¶ 5. Carolina alleges that their conduct "caus[e]d me to get sick jeop[a]rdizing my already illness of cardiomyopathy placing me at risk!" *Id.*

Viewing Carolina's pleadings most liberally, I construe Carolina's third amended complaint as alleging that Dr. Feder and Nurse Malissa acted with deliberate indifference to his underlying condition of cardiomyopathy by requiring him to quarantine. Carolina alleges that

Nurse Malissa misconstrued his coughing and shortness of breath as symptoms of COVID-19 rather than as side effects of his prescribed medication.  Carolina also alleges that Nurse Malissa then told Dr. Feder that Carolina might be COVID-19 positive.  Dr. Feder then ordered that Carolina be placed in quarantine under an "assumption" that he was COVID-19 positive even though Carolina had not yet been given any COVID-19 test.

Carolina's complaints against Dr. Feder and Nurse Malissa regarding his forced quarantine have no merit.  That is because Carolina merely challenges those defendants' medical judgment.  The law is well-settled that "the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law," and so "not every lapse in prison medical care will rise to the level of a constitutional violation."  *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003); *see also Harris v. Westchester Cty. Med. Ctr.*, 2011 WL 2637429, at *3 (S.D.N.Y. July 6, 2011) ("[W]ithout more, allegations of negligent treatment and misdiagnosis do not state a cause of action under the Eighth Amendment.") (cleaned up).  Thus, an inmate may not bring an Eighth Amendment claim based on a negligent "delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs."  *Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir. 2000).  Of course, "[c]onsciously disregarding an inmate's legitimate medical need is not mere medical malpractice."  *Id.* (cleaned up).

Carolina admits that he presented with COVID-19 symptoms, including a cough and shortness of breath.  *See Symptoms*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last updated Dec. 22, 2020) (listing cough and shortness of breath as symptoms of COVID-19).  Carolina simply disagrees with (1) Nurse Malissa's decision to inform Dr. Feder about Carolina's symptoms and (2) Dr. Feder's medical assessment of his symptoms.  Similarly, Carolina

expresses displeasure that he was forced to quarantine before testing positive for COVID-19 and was forced to continue quarantining after testing negative. But Carolina's belief that his quarantine status should have been tied exclusively to COVID-19 test results is simply his own medical assessment.

In normal times, courts must "accord substantial deference to the professional judgment of prison" officials on matters of prison administration. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *see also Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir. 1995). In attempting to prevent and stem COVID-19 outbreaks, prison officials are plainly entitled to that substantial deference. COVID-19 poses an incredible risk in prisons and detention centers. *See United States v. Skelos*, 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020) ("Jails and prisons are powder kegs for infection."); *United States v. Williams*, 2020 WL 7048244, at *2 (S.D.N.Y. Dec. 1, 2020); *United States v. Mongelli*, 2020 WL 4738325, at *2 (E.D.N.Y. Aug. 14, 2020) ("[T]he COVID-19 pandemic poses a serious health risk to this country's prison populations."); *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 135 (2d Cir. 2020) (describing COVID-19 as a "dramatic challenge" and "recent emergency," the "impact" of which "on jail and prison inmates . . . may be grave and enduring"). Especially considered in that light, Nurse Malissa and Dr. Feder's medical judgment seems highly sensible and Carolina's complaints seem essentially trivial. Moreover, Carolina's allegations indicate no facts raising an inference that Dr. Feder or Nurse Malissa consciously disregarded a known risk to Carolina by arranging for his quarantine. Carolina's allegations do not even raise an inference that Dr. Feder or Nurse Malissa acted negligently. Thus, I dismiss Carolina's complaint insofar as it alleges Eighth Amendment violations against Dr. Feder and Nurse Malissa based on their medical decisions regarding Carolina's forced quarantine.

2. Claims Regarding Alleged Deprivations During Quarantine

Carolina alleges that Dr. Feder placed him in a non-handicap cell during his two-week quarantine and that she failed to act on his requests to be moved to a handicap cell after he tested negative for COVID-19 so that he could wash up, shower, have clean clothes and laundry, and could make legal and social phone calls. *See* Third Am. Compl., Doc. No. 26, at 8. Similarly, Carolina alleges that Nurse Stepheny failed to act on his requests. *Id.* at ¶ 4, 16, 18. Carolina does not allege that Nurse Malissa had any personal involvement in his placement in a non-handicap cell or that she ignored Carolina's requests once he was in the non-handicap cell.

Although, as I explain below, I need not reach the question, I note briefly that Carolina's allegations do not appear to state viable Eighth Amendment claims. Inmates have a right to sanitary living conditions and the necessary materials to maintain adequate personal hygiene. *See Walker v. Schult*, 717 F.3d 119, 127 (2d Cir. 2013). More specifically, and as relevant to this case, a "denial of showers rises to the level of an Eighth Amendment violation when such a denial deprives the prisoner of basic human needs," but "[c]ourts are reluctant to consider the temporary deprivation of showers a constitutional violation." *Dillon v. City of N.Y.*, 2013 WL 3776167, at *2 (S.D.N.Y. July 18, 2013). There is no bright-line test for an Eighth Amendment claim based on unsanitary conditions, but "both the duration and the severity of the exposure" are relevant considerations. *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015). To succeed on such a claim, the circumstances must have been "egregious," such as, for instance, situations in which "a prisoner's cell is filled with human feces, urine, and sewage water." *McFadden v. Noeth*, 827 F. App'x 20, 29 (2d Cir. 2020) (cleaned up).

Carolina's claims regarding temporary (1) deprivation of his personal hygiene and (2) unsanitary conditions of confinement are weak. Regarding (1), courts in this Circuit have held

that temporary denials of access to a shower for up to two weeks typically do not satisfy the objective prong of an Eighth Amendment deliberate indifference claim. *See, e.g.*, *Crichlow v. Fischer*, 2017 WL 6466556, at *15 (N.D.N.Y. Sept. 5, 2017); *McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003); *Cruz v. Jackson*, 1997 WL 45348, at *7 (S.D.N.Y. Feb. 5, 1997). Regarding (2), Carolina's allegations do not resemble a cell "filled with human feces, urine, and sewage water." *McFadden*, 827 F. App'x at 29. Instead, Carolina alleges that, during his two-week quarantine, he had no access to a shower, hand soap, cell cleaning materials, and laundered clothes and bedding and that his sink water "r[an] low and improper." Third Am. Compl., Doc. No. 26, at 8, 16, 28, 32, 36.[11] Those relatively minor concerns—although surely unpleasant—do not rise to the level of a constitutional violation. *See Mahase v. City of New York,* 2000 WL 263742, at *6 (E.D.N.Y. Jan. 5, 2000) (noting that "short-term confinement under unsanitary or uncomfortable conditions, without more, typically does not amount to a constitutional violation").

The closest that Carolina comes to alleging a plausible Eighth Amendment violation regards his placement in a non-handicap cell. That allegation *may* raise an inference that Carolina was exposed to a serious risk to his safety. *See Lenti v. Connecticut*, 2020 WL 2079462, at *5 (D. Conn. Apr. 30, 2020) (concluding that plaintiff, who had been placed in a non-ADA compliant cell, had "sufficiently alleged that the Defendants are subjecting him to a serious risk to his safety by not providing a wheelchair and grab bars, which would enable him to use the toilet and the sink").[12]

---

[11] I acknowledge that, in his second amended complaint, Carolina alleges substantially more unsanitary conditions. *See, e.g.*, Second Am. Compl., Doc. No. 20, at ¶ 3 ("While in this none handicap cell this Petitioner had deffacated, urinated on self" and so had to "wash his hands and face with toilet water and rinse oraly after each meal"). Notably, however, those allegations are absent in both Carolina's first and third amended complaints.

[12] Even if Carolina had properly presented that claim, I note that Carolina fails to suggest that either Dr.

In any event, I need not determine whether Carolina has stated any plausible Eighth Amendment claims because Carolina is barred from bringing those claims in a lawsuit in federal court: It is clear from Carolina's third amended complaint—and the documents Carolina attached to that complaint—that Carolina has not exhausted his administrative remedies.

The PLRA requires prisoners to exhaust available administrative remedies before filing a federal lawsuit regarding prison conditions. *See* 42 U.S.C. § 1997e(a).[13] Section 1997e(a) applies to all claims regarding prison life, *Porter v. Nussle*, 534 U.S. 516, 532 (2002), and it requires exhaustion of any available administrative remedies, regardless of whether they provide the relief the inmate seeks. *See Booth v. Churner*, 532 U.S. 731, 741 (2001). A claim is not exhausted until the inmate complies with all administrative deadlines and procedures. *See Woodford v. Ngo*, 548 U.S. 81, 90–93 (2006). A prisoner who does not complete the exhaustion process until after filing a federal lawsuit has not satisfied the exhaustion requirement. *See Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001) ("Subsequent exhaustion after suit is filed therefore is insufficient."), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516 (2002); *Gulley v. Bujnicki*, 2019 WL 2603536, at *3 (D. Conn. June 25, 2019).

The exhaustion requirement may be excused when a remedy is not available in practice even if it is "officially on the books." *Ross v. Blake*, 136 S. Ct. 1850, 1858–59 (2016). This means that "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859 (quoting

---

Feder or Nurse Stepheny had the ability to determine his place of confinement during quarantine. *See Warwick v. Doe*, 2020 WL 2768804, at *5 (D. Conn. May 27, 2020) (explaining that absent facts suggesting that the defendant actually had and failed to exercise the power to get plaintiff in to see a dental surgeon sooner, plaintiff's allegations amounted to, at most, negligence).

[13] Section 1997e(a) provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

*Booth*, 532 U.S. at 738).  The United States Supreme Court has established three kinds of

circumstances in which an administrative remedy might be unavailable:  (1) "when (despite what

regulations or guidance materials may promise) it operates as a simple dead end—with officers

unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when a

procedure is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "when

prison administrators thwart inmates from taking advantage of a grievance process through

machination, misrepresentation, or intimidation."  *Id.* at 1859–60.  "Whether an administrative

remedy was available to a prisoner in a particular prison or prison system is ultimately a question

of law, even when it contains factual elements."  *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d

54, 59 (2d Cir. 2015).

      Failure to exhaust administrative remedies is an affirmative defense.  *See Jones v. Bock*,

549 U.S. 199, 216 (2007).  Thus, "unless it is unmistakably clear that the court lacks jurisdiction,

or that the complaint lacks merit or is otherwise defective, . . . it is bad practice for a district

court to dismiss without affording a plaintiff the opportunity to be heard in opposition."  *Mojias

v. Johnson*, 351 F.3d 606, 610–11 (2d Cir. 2003) (cleaned up).  However, "a district court still

may dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of

the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement."  *Williams v.

Priatno*, 829 F.3d 118, 122 (2d Cir. 2016); *see also Ramos v. Malloy*, 2020 WL 4569854, at *5

(D. Conn. Aug. 8, 2020) (dismissing plaintiff's complaint, on initial review, based on failure to

exhaust, but granting plaintiff leave to file a motion to amend complaint if plaintiff could show

that he did exhaust administrative remedies).

With respect to his claims against DOC medical staff, one particular DOC administrative directive is relevant: Administrative Directive 8.9 ("A.D. 8.9").[14] A.D. 8.9 provides for two types of HSRs: (1) "Diagnosis and Treatment," which includes a decision not to provide treatment, and (2) "Review of an Administrative Issue," which addresses concerns regarding "a practice, procedure, administrative provision or policy, or an allegation of improper conduct by a health services provider." A.D. 8.9(9). Both types of HSRs require an inmate to "seek an informal resolution prior to filing for a" HSR. *Id.* at 8.9(10). That informal resolution attempt must occur either "face to face with the appropriate staff member or with a supervisor via written request utilizing CN 9601 Inmate Request Form." *Id.* If an inmate pursues the written option, a DOC official must respond within 15 calendar days. *Id.*

When an inmate seeks review of a diagnosis or treatment, the following procedure applies. If informal resolution is "unsuccessful," an inmate "may apply for" a HSR by: "utilizing [a] CN 9602 Inmate Administrative Remedy form," "check[ing] the 'Diagnosis/Treatment' box," "explain[ing] concisely the cause of his/her dissatisfaction," and "deposit[ing] the completed form in the Health Services Remedies/Review box." *Id.* at 8.9(11). Upon receipt of a CN 9602, the HSR coordinator must schedule a HSR appointment with the appropriate health care provider (e.g., physician, dentist, or psychologist/psychiatrist). *Id.* at 8.9(11)(A). If the health care provider decides that the existing diagnosis or treatment is appropriate, "the inmate shall have exhausted the" HSR process. *Id.* In that case, the health care provider must notify the inmate of the decision, in writing, within 10 business days by indicating

[14] Pursuant to Fed. R. Evid. 201, I take judicial notice of the contents of A.D. 8.9. *See, e.g., Barfield v. Milling*, 2015 WL 1737671, at *3 n. 1 (D. Conn. Apr. 16, 2016) ("The Court can take judicial notice of the State of Connecticut Administrative Directives that are found on the Department of Correction's website."); *see also Directives and Policies*, CONN. DEP'T OF CORR., https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Directives-and-Polices-Links (last visited Jan. 26, 2021) (navigate to Chapter 8).

"No Further Action" in the disposition field of the relevant CN 9602. *Id.* On the other hand, if the health care provider "decides that a different diagnosis or treatment is warranted," the health care provider "may either (1) act on his/her decision; or, (2) refer the case to the Utilization Review Committee for authorization by indicating 'Change of Treatment' or 'Referred to URC' as appropriate, in the disposition field of CN 9602." *Id.* at 8.9(11)(B).

When an inmate seeks review of an administrative issue, the following procedure applies. An inmate may request review of an "Administrative Issue" by submitting a CN 9602 form, checking the box marked "All Other Health Care Issues," concisely describing the issue, and depositing the form in the Health Services box. *Id.* at 8.9(12). The HSR coordinator will evaluate, investigate, and decide the request for review within 30 days. *Id.* at 8.9(12)(A). If dissatisfied with the HSR coordinator's decision, an inmate may appeal within 10 business days. *Id.* at 8.9(12)(B). The designated facility health services director or designee must decide and respond to the appeal within 15 business days. *Id.* at 8.9(12)(C). For all issues relating to compliance with existing standards, that appellate review is final, and the inmate shall have exhausted the HSR process. *Id.* If the matter relates to a DOC health service policy, "the inmate may appeal to the DOC Director of Health Services" up to 10 business days after receiving the response to his or her appeal. *Id.* at 8.9(12)(D). In that case, the DOC Director of Health Services has 30 business days to respond. *Id.* at 8.9(12)(E). Upon receipt of that decision, the inmate shall have exhausted the HSR process for an administrative issue. *Id.*

Carolina's complaint—and the documents attached to it—indicates that Carolina did not complete the HSR process before filing suit. On May 11 (after completing his quarantine), Carolina filed a CN 9602 regarding Dr. Feder and requested a HSR by checking the box for "All Other Health Services Issues." *See* Third Am. Compl., Doc. No. 26, at 9–10. In that CN 9602,

Carolina complained about his conditions of confinement and Dr. Feder's refusal to transfer him to a handicap cell even though she knew Carolina had tested negative for COVID-19. Also on May 11, Carolina filed another CN 9602 regarding Nurse Stepheny and requested a HSR by checking the box for "All Other Health Care Issues." *See id.* at 18–19. In that CN 9602, Carolina complained about the failure of Nurse Stepheny to have Carolina moved to a handicap cell. *See id.* On May 14, a DOC official rejected both those HSRs. *See id.* at 9 (Dr. Feder), 18 (Nurse Stepheny).

Carolina filed this federal lawsuit on May 12. *See* Compl., Doc. No. 1.[15] In doing so, filed suit before exhausting his administrative remedies pursuant to A.D. 8.9. Carolina filed this lawsuit before he had received any response to the two HSRs described above regarding Dr. Feder and Nurse Stepheny. In fact, Carolina attempted to file this lawsuit on the very same day he filed both those CN 9602 forms. *See* Compl., Doc. No. 1, at 1 ("[N]ow its 5/11/20."). Carolina's third amended complaint—and the documents attached to it—makes clear that Carolina failed to proceed through the necessary procedural steps before filing this lawsuit, insofar as it regards the roles of Dr. Feder and Nurse Stepheny in his forced quarantine. Moreover, the record raises no inference that administrative remedies were "unavailable" as set forth under *Ross*, 136 S. Ct. at 1856, 1858–60. What is more, Carolina is well aware of the PLRA's exhaustion requirement because, in his extensive experience litigating constitutional claims before this court, Carolina has had several claims dismissed based on non-exhaustion. *See, e.g.*, Ruling and Order, Doc. No. 9, at 4–5, *Carolina v. Knight, et al.*, No. 3:16-cv-1156 (AVC); Initial Review Order, Doc. No. 14, at 12–13, *Carolina v. Yvonn, et al.*, No. 3:19-cv-1077

[15] In fact, Carolina's original complaint was signed and dated May 6 and May 11. *See* Compl., Doc. No. 1, at 1 (writing, in the signature line, "Tyrone D. Carolina 5/6/20 now its 5/11/20").

(AVC). Because Carolina did not exhaust his administrative remedies before filing this complaint on May 12, I dismiss his Eighth Amendment claims against Dr. Feder and Nurse Stepheny. *See Jackson v. Doe Kitchen Manager*, 2020 WL 4569859, at *5–6 (D. Conn. Aug. 8, 2020).[16]

B. Claims against Correctional Staff

As described above, Carolina asserts Eighth Amendment claims against Warden Martin, Lieutenant Vallero, Lieutenant Jusseaume, and Officer Daily (the "Correctional Defendants"). Carolina makes substantially the same allegations against all four Correctional Defendants: They failed to order that Carolina be transferred to a handicap cell and provided with a shower, clean clothes, laundered sheets and blankets, and legal and social phone calls after Carolina tested negative for COVID-19. *See, e.g.*, Third Am. Compl., Doc. No. 26, at ¶¶ 9–13; 22.

Just as above, I note that Carolina's allegations regarding the Correctional Defendants do not appear to state viable Eighth Amendment claims. That is because—even assuming that Carolina has alleged sufficiently serious deprivations to satisfy the "objective" prong of Eighth Amendment's deliberate indifference test[17]—Carolina alleges no facts to suggest that any of the

[16] Carolina does not assert a claim under Title II of the Americans with Disabilities Act based on his confinement in a non-handicap cell. However, even if he did, the same exhaustion analysis would apply, and I would dismiss that claim for the same reasons articulated above. *See Colón v. New York State Dep't of Corr. and Community Supervision*, 2017 WL 4157372, at *5 n.4 (S.D.N.Y. Sept. 15, 2017); *see also O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1061–62 (9th Cir. 2007) (ADA claims subject to PLRA exhaustion requirement).

[17] Although I assume for purposes of this ruling that Carolina has adequately alleged facts to satisfy the objective prong of the Eighth Amendment's deliberate indifference test, I do not intend to communicate that Carolina's claims are strong. In fact, to the contrary, they appear weak. For instance, I have already explained why Carolina's claim regarding temporary deprivation of a shower likely fails to state claim. *See supra* pp. 16–17. Similarly, Carolina's allegations regarding a temporary deprivation of telephone privileges appears weak. Indeed, courts considering prison telephone restrictions have agreed that "[p]risoners have no constitutional right to unlimited telephone use." *Altayeb v. Chapdelaine*, 2016 WL 7331551, at *6 (D. Conn. Dec. 16, 2016) (citing *Pitsley v. Ricks*, 2000 WL 362023, at *4 (N.D.N.Y. Mar. 31, 2000)); *see also Bellamy v. McMickens*, 692 F. Supp. 205, 214 (S.D.N.Y. 1988) (explaining that "states have no obligation to provide the best manner of access to counsel" and "restrictions on inmates' access to counsel via the telephone may be permitted as long as prisoners have some manner of access to counsel"). Here, Carolina has not claimed he was denied absolute access to counsel, and so he has likely not alleged a constitutional violation based on his temporary denial of telephone access.

Correctional Defendants acted with "a conscious disregard of a substantial risk of serious harm." *Chance*, 143 F.3d at 703.  However, also as above, I need not resolve that issue because Carolina's third amended complaint (and relevant attachments) demonstrates that Carolina failed to exhaust administrative remedies.

Because Carolina's claims against the Correctional Defendants concern custodial staff members' alleged deliberate indifference to his conditions of confinement, Carolina was obligated to exhaust his administrative remedies pursuant to Administrative Directive 9.6 ("A.D. 9.6").  *See* A.D. 9.6(1) (noting that A.D. 9.6 "provide[s] a means for an inmate to seek formal review of an issue relating to any aspect of an inmate's confinement that is subject to the Commissioner's authority");[18] *Cosby v. Tawana*, 2020 WL 4284561, at *4 (D. Conn. July 27, 2020).  On several occasions, Carolina appears to have filed grievances but checked boxes corresponding to appeals of special management decisions[19] or ADA decisions.[20]  To the extent that Carolina actually intended to file appeals of special management decisions or ADA decisions, Carolina's exhaustion requirements are set forth, respectively, in A.D. 9.6(8) and A.D. 9.6(15).

The first step for obtaining an administrative remedy pursuant to A.D. 9.6(6) requires an inmate to seek informal resolution of the issue.  A.D. 9.6(6)(A).  If an "attempt to resolve the issue verbally with the appropriate staff member" fails, then the inmate must submit an Inmate Request Form (Form CN 9601) that "clearly state[s] the problem and the action requested to

---

[18] *See Directives and Policies*, CONN. DEP'T OF CORR., https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Directives-and-Polices-Links (last visited Jan. 26, 2021) (navigate to Chapter 9).  I have already explained that I may take judicial notice of administrative directives.  *See supra* n.14.

[19] *See supra* nn. 8–9.

[20] *See supra* nn. 7, 10.

remedy the issue." *Id.* After an inmate submits a written Inmate Request Form, the DOC shall respond to the inmate within 15 business days. *Id.*

If an inmate is either unsatisfied with the DOC's response to his or her Inmate Request Form or the DOC fails to respond within 15 business days, that inmate may file a "Level 1" grievance (Form CN 9602). *See id.* at 9.6(6)(C). When an inmate submits a Level 1 grievance, the inmate must attach the returned Inmate Request Form, which will include "the appropriate staff member's response." *Id.* If the inmate never received a response to his or her Inmate Request Form, the inmate must indicate on his or her Level 1 grievance why the Inmate Request Form is not attached. *Id.* An inmate must file a Level 1 grievance "within 30 calendar days of the occurrence or discovery of the cause of the grievance." *Id.*

If an inmate's Level 1 grievance fails to comply with the above procedural requirements, then the DOC may either (1) reject the grievance or (2) return it without disposition, in which case the inmate will have an opportunity to re-file the grievance "after the inmate has corrected the error." *Id.* at 9.6(6)(E), (F). The DOC must respond in writing to an inmate's Level 1 grievance within 30 business days of receiving it. *Id.* at 9.6(6)(I).

If an inmate's Level 1 grievance is returned without disposition for failure to comply with procedural requirements, the inmate may not appeal that decision but may, instead, correct the error and re-file the grievance. *Id.* at 9.6(6)(E), (G). If an inmate's Level 1 grievance is returned with a disposition, an inmate may file a Level 2 appeal within five calendar days after receiving that disposition. *Id.* at 9.6(6)(G), (K). If the DOC failed to respond to the Level 1 grievance in a timely manner—that is, within 30 business days of receiving it—an inmate may file a Level 2 appeal "within 65 days from the date of filing" the Level 1 grievance. *Id.* at 9.6(6)(M). Level 2 appeals by inmates confined in Connecticut correctional facilities are reviewed by the

appropriate District Administrator.  *Id.* at 9.6(6)(K).  The District Administrator is required to respond to an inmate's Level 2 appeal within 30 business days of receipt of the appeal.  *Id.*

Level 3 appeals are restricted to challenges to department policy, the integrity of the grievance procedure, or instances in which the District Administrator does not reply to an inmate's Level 2 appeal in a timely manner.  *Id.* at 9.6(6)(L).

An inmate may also appeal an "initial special management decision . . . by completing and depositing CN 9602, Inmate Administrative Remedy Form, in the Administrative Remedies box within 15 calendar days of a decision regarding" (a) administrative segregation, (b) special needs management, (c) high security, (d) chronic discipline, and (e) protective custody.  *Id.* at 9.6(8).  A DOC official must respond to that appeal, in writing, within 15 business days, and that decision is not subject to further appeal.  *Id.*

An inmate may also appeal an ADA decision "by completing and depositing CN 9602, Inmate Administrative Remedy Form, in the Administrative Remedies box within 15 calendar days of meeting with the Unit ADA Coordinator."  *Id.* at 9.6(15).  The "ADA Coordinator in consultation with the appropriate District Administrator" must respond to the appeal, in writing, within 15 business days, and that decision is not subject to further appeal.  *Id.*

Carolina has not exhausted his administrative remedies, no matter which procedure—A.D. 9.6(6), (8) or (15)—is applicable.  On May 11, Carolina filed grievances against the Correctional Defendants concerning his conditions of confinement during quarantine.  *See* Third Am. Compl, Doc. No 26, at 24–25 (Warden Martin), 30–31 (Lieutenant Vallero), 34–35 (Lieutenant Jusseaume), 38–39 (Officer Daily).  Each of those grievances concerned the same issues:  Carolina complained that each defendant (1) failed to move him to a handicap cell in the wake of his negative COVID-19 test and thus (2) deprived Carolina of personal

hygiene (showers, laundry and cell cleanups) and legal and social phone calls during his two-week quarantine. *Id.* On May 13, all four grievances were returned without disposition. *Id.* at 40–43. Thus, Carolina filed this federal lawsuit before he had received responses to those four grievances. Moreover, the fact that Carolina was in the middle of the grievance process when he filed this lawsuit demonstrates that administrative remedies were available to him—but that he failed to take all of the steps necessary to enable the DOC to address his issues on the merits. *See Woodford*, 548 U.S. at 90; *Ross*, 136 S. Ct. at 1856, 1858–60. Accordingly, I dismiss Carolina's claims against the Correctional Defendants.

**ORDERS**

For the foregoing reasons, Carolina's third amended complaint, doc. no. 26, is DISMISSED.

If Carolina believes he can allege facts to cure the deficiencies identified in this Order, he may file a motion to reopen the case and attach an amended complaint within thirty (30) days from the date of this order. Carolina must demonstrate that he satisfied his exhaustion requirements under the PLRA before initiating this action. If he admits that he did not satisfy the exhaustion requirement, Carolina must explain why he is excused from that requirement based on the unavailability of administrative remedies.

Carolina is again advised that any amended complaint will completely replace the prior complaint in this action and that no portion of any prior complaints shall be incorporated into his third amended complaint by reference.

The Clerk is instructed to close this case.

SO ORDERED at Bridgeport, Connecticut this 26th day of January 2021.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge